IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| DAVID DEPYPER and KATE MILASHUS, Individually and on Behalf of All Other Persons Similarly Situated, | Case No. 1:20-cv-02317 |
| | Judge Mary M. Rowland |
| Plaintiffs, | |
| v. | |
| ROUNDY'S SUPERMARKETS INC. and ROUNDY'S ILLINOIS, LLC, d/b/a MARIANO'S, | |
| Defendants. | |
| and | Case No. 1:22-cv-02084 |
| SHERIE PLETSCH, Individually and on Behalf of All Other Persons Similarly Situated, | Judge Mary M. Rowland |
| Plaintiff, | |
| v. | |
| ROUNDY'S SUPERMARKETS INC. and ROUNDY'S ILLINOIS, LLC, d/b/a MARIANO'S, | |
| Defendants. | |

**PLAINTIFFS' MOTION FOR FINAL FLSA COLLECTIVE CERTIFICATION AND RULE 23 CERTIFICATION OF AN ILLINOIS CLASS**

i

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ........................................................................................................ 1

PROCEDURAL HISTORY…………………………………………………………….4

STATEMENT OF FACTS………………………………………………………………..5

    1.    Plaintiffs Performed Substantially Similar Job Duties…………………………6

    2.    Mariano's Uniformly Classified All DMs As Exempt in 2016……………….8

ARGUMENT………………………………………………………………………….15

I.    The Applicable Rule 23 Standards ................................................................ 15

    A.    Rule 23(a)'s Requirements are Met................................................. 16

        1. Numerosity under Rule 23(a)(1)…………………………………………16

        2. Commonality under Rule 23(a)(2)..................................................... 16

        3. Typicality under Rule 23(a)(3). ....................................................... 18

        4. Adequacy under Rule 23(a)(4)......................................................... 19

    B.    Rule 23(b)(3)'s Requirements are Met. ............................................ 20

        1.  Common Questions Predominate. ..................................................... 20

        2.  A Class Action Is a Superior Method of Adjudicating the Claims Here. ........ 24

    C.    Alternatively, A Rule 23(c)(4) Issues Class Could be Certified ........................... 26

II.    PLAINTIFF'S MOTION FOR FINAL CERTIFICATION OF THE FLSA COLLECTIVE SHOULD BE GRANTED ................................................ 26

    A.    Standard for FLSA Final Certification ................................................ 27

        1. The Court Should Approve Final FLSA Certification Because Plaintiffs Satisfy the Standards of Rule 23 ...................................................... 27

        2. Plaintiffs Satisfy the Criteria for FLSA Final Approval in this Circuit........... 28

            a.  Plaintiffs Share Similar Factual and Employment Settings…………..…..29

            b.  Defendants' Affirmative Defenses Do Not Require Individualized Application……………………………………………………………….32

            c.  Uniform Evidence re: FLSA Willfulness and "Good Faith" Defense……………………………………………………………....34

            d.  Fairness and Procedural Concerns Demand Final Certification………...35

CONCLUSION……………………………………………………………………………36

i

## Table of Authorities

*Alvarez v. City of Chi.*,
605 F.3d 445 (7th Cir. 2010) ................................................. 33

*Amchem Prods. v. Windsor*,
521 U.S. 591 (1997) ................................................. 15, 19

*Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*,
568 U.S. 455 (2013) ................................................. 21

*Bell v. PNC Bank, N.A.*,
800 F.3d 360 (7th Cir. 2015) ................................................. *passim*

*Carlisle v. Dolgencorp, Inc.*,
No. 1:10-cv-490-WTL-MJD, 2012 U.S. Dist. LEXIS 65123 (S.D. Ind. May 9, 2012) ........ 13

*Carpenters Pension Tr. Fund for N. Cal. v. Allstate Corp. (In re Allstate Corp. Sec. Litig.)*,
966 F.3d 595 (7th Cir. 2020) ................................................. 15

*Charlot v. Ecolab, Inc.*,
No. 18-10528 (KM) (MAH), 2019 U.S. Dist. LEXIS 217484 (D.N.J. Dec. 17, 2019) ........ 24

*Comcast Corp. v. Behrend*,
569 U.S. 27 (2013) ................................................. 22

*Costello v. BeavEx, Inc.*,
810 F.3d 1045 (7th Cir. 2016) ................................................. 21

*Damassia v. Duane Reade, Inc.*,
250 F.R.D. 152 (S.D.N.Y. 2008) ................................................. 2, 5, 21, 34

*Davis v. Charter Foods, Inc.*,
No. 2:20-CV-00159-CEA, 2022 U.S. Dist. LEXIS 195498 (E.D. Tenn. Mar. 21, 2022) ........ 2

*Dennis v. Greatland Home Health Servs.*,
591 F. Supp. 3d 320 (N.D. Ill. 2022) ................................................. 29, 28, 29, 35

*Eisen v. Carlisle & Jacquelin*,
417 U.S. 156 (1974) ................................................. 16

*FLSA. Pietrzycki v. Heights Tower Serv.*,
197 F. Supp. 3d 1007 (N.D. Ill. 2016) ................................................. 27

*Gomez v. St. Vincent Health, Inc.*,
649 F.3d 583 (7th Cir. 2011) ................................................. 19

*Goodman v. Burlington Coat Factory*,
2019 U.S. Dist. LEXIS 223588 (D.N.J. Nov. 20, 2019) ................................................. 2, 31

*Greko v. Diesel U.S.A., Inc.*,
277 F.R.D. 419 (N.D. Cal. 2011) ........................................................................ 8

*Gunn v. Stevens Sec. & Training Servs.*,
No. 17-cv-06314, 2019 U.S. Dist. LEXIS 100868 (N.D. Ill. June 17, 2019) ........ 17

*Haas v. Behr Dayton Thermal Prods., LLC*,
No. 3:07cv139, 2008 U.S. Dist. LEXIS 122184 (S.D. Ohio Dec. 22, 2008) .......... 14

*Howard v. Cook Cty. Sheriff's Office*,
989 F.3d 587 (7th Cir. 2021) ............................................................................ 18

*Hudgins v. Total Quality Logistics, LLC*,
No. 16 C 7331, 2019 U.S. Dist. LEXIS 13793 (N.D. Ill. Jan. 29, 2019) ........ 29, 33

*In re Hair Relaxer Mktg. Sales Pracs. & Prods. Liab. Litig.*,
2024 U.S. Dist. LEXIS 175590 (N.D. Ill. Sep. 27, 2024) .................................. 20

*In re IKO Roofing Shingle Prods. Liab. Litig.*,
757 F.3d 599 (7th Cir. 2014) ............................................................................ 16

*In re Unum Grp. Corp.*,
No. 23-0503, 2023 U.S. App. LEXIS 33512 (6th Cir. Dec. 18, 2023) ................ 23

*Jacks v. Directsat USA, LLC*,
118 F.4th 888 (7th Cir. 2024) ............................................................................ 26

*Keele v. Wexler*,
149 F.3d 589 (7th Cir. 1998) ............................................................................ 18

*Kramer v. Am. Bank & Tr. Co.*,
N.A., No. 11 C 8758, 2017 U.S. Dist. LEXIS 48360 (N.D. Ill. Mar. 31, 2017) .................... 17

*Kurgan v. Chiro One Wellness Ctrs. LLC*,
No. 10-cv-1899, 2014 U.S. Dist. LEXIS 20255 (N.D. Ill. Feb. 19, 2014) .......... 17, 18-19, 20

*Lofton v. Eym Pizza of Ill., LLC*,
No. 18-cv-5743, 2024 U.S. Dist. LEXIS 150917 (N.D. Ill. Aug. 22, 2024) ........ 25, 19

*Lukas v. Advocate Health Care Network & Subsidiaries*,
No. 1:14-cv-2740, 2015 U.S. Dist. LEXIS 109851 (N.D. Ill. Aug. 19, 2015) .......... 24, 15, 28

*McCaster v. Darden Rests., Inc.*,
845 F.3d 794 (7th Cir. 2017) ............................................................................ 22

*McFields v. Dart*,
982 F.3d 511 (7th Cir. 2020) ............................................................................ 18

*McMahon v. LVNV Funding, LLC*,

807 F.3d 872 (7th Cir. 2015) ................................................................. 26

*Messner v. Northshore Univ. HealthSystem,*
669 F.3d 802 (7th Cir. 2012) ................................................................. 15

*Meyer v. United States Tennis Ass'n,*
297 F.R.D. 75 (S.D.N.Y. 2013) ............................................................. 25

*Morgan v. Family Dollar Stores,*
551 F.3d 1233 (11th Cir. 2008) ........................................................ 33, 23

*Muro v. Target Corp.,*
580 F.3d 485 (7th Cir. 2009) ................................................................. 18

*Noe v. Smart Mortg. Ctrs., Inc.,*
No. 1:21-CV-01668, 2024 U.S. Dist. LEXIS 176268 (N.D. Ill. Sep. 29, 2024) ................... 34

*O'Brien v. Encotech Constr. Servs.,*
203 F.R.D. 346 (N.D. Ill. 2001) ............................................................. 25

*O'Leary v. Humana Ins. Co.,*
No. 17-C-1774, 2020 U.S. Dist. LEXIS 222782 (E.D. Wis. Nov. 30, 2020) ........................ 33

*Patzfahl v. FSM Za, LLC,*
No. 20-cv-1202, 2022 U.S. Dist. LEXIS 230073 (E.D. Wis. Dec. 19, 2022) ....................... 19

*Prinzo v. Hannaford Bros. Co., LLC,*
343 F.R.D. 250 (D. Mass. 2023) ..................................................... 1, 17, 2, 21

*Retired Chi. Police Ass'n v. City of Chi.,*
7 F.3d 584 (7th Cir. 1993) ..................................................................... 18

*Rieve v. Coventry Health Care, Inc.,*
870 F. Supp. 2d 856 (C.D. Cal. 2012) ....................................................... 13

*Rivet v. Office Depot, Inc.,*
207 F. Supp. 3d 417 (D.N.J. 2016) ............................................................ 2

*Ross v. RBS Citizens, N.A.,*
667 F.3d 900 (7th Cir. 2012) .............................................................. 22, 23

*Salim Shahriar v. Smith & Wollensky Rest. Grp., Inc.,*
659 F.3d 234 (2d Cir. 2011) .................................................................. 25

*Slaaen v. Senior Lifestyle Corp.,*
No. 18-CV-1562-JPS, 2019 U.S. Dist. LEXIS 61041 (E.D. Wis. Apr. 9, 2019) ................. 27

*Smith v. Family Video Movie Club, Inc.,*
No. 11 C 1773, 2015 U.S. Dist. LEXIS 43335 (N.D. Ill. Mar. 31, 2015) .............................. 36

iv

*Stillman v. Staples, Inc.*,
No. 07-849 (KSH), 2009 U.S. Dist. LEXIS 42247 (D.N.J. May 11, 2009) .................. *passim*

*Suchanek v. Sturm Foods, Inc.*,
764 F.3d 750 (7th Cir. 2014) ............................................................... 17

*Tonyan v. Dunham's Athleisure Corp.*,
966 F.3d 681 (7th Cir. 2020) ............................................................... 7

*Torres v. Gristede's Operating Corp.*,
2006 U.S. Dist. LEXIS 74039 (S.D.N.Y. Sep. 28, 2006) ...................... 25

*Wal-Mart Stores, Inc. v. Dukes*,
564 U.S. 338 (2011) ............................................................... 16

*Youngblood v. Family Dollar Stores, Inc.*,
2011 U.S. Dist. LEXIS 115389 (S.D.N.Y. Oct. 4, 2011) ...................... 2, 17

## Federal Statutes

29 U.S.C. § 255 ............................................................... 34

29 C.F.R. § 541.700 ............................................................... 14

## Rules

Fed. R. Civ. P. 23 ............................................................... *passim*

## Other Authorities

Andrew C. Brunsden, Hybrid Class Actions, Dual Certification, and Wage Law Enforcement in the Federal Courts, 29 Berkeley J. Emp. & Lab. L. 269, 291-94 (2008) ...................................... 25

## INTRODUCTION

Plaintiffs move (1) to certify a Rule 23 class of all individuals who worked in a Mariano's Deli, Hot Foods, Bakery, and/or Meat department manager-titled position ("DM") that was internally classified by Defendants as exempt from Illinois' overtime laws, for which they were paid a weekly salary at any time between April 14, 2017 (for Meat and Bakery departments) or April 21, 2019 (for Deli and Hot Foods departments) through the date of judgment (the "class") and (2) to grant final certification of the conditionally-certified collectives in both the *DePyper* and *Pletsch* cases, the former of which now includes 28 members and the latter of which includes 76 members. Hilbert Dec. ¶¶ 4-5.

Courts have granted class certification of similar, even nearly ***identical***, lower-level retail manager exemption misclassification cases. In *Prinzo v. Hannaford Bros. Co., LLC*, 343 F.R.D. 250 (D. Mass. 2023), for example, the court certified a state law Rule 23 class of fresh department manager positions (Bakery, Deli, Meat, Produce and Seafood Managers) on allegations that the multi-state grocery employer misclassified them as administrative/executive exempt, finding:

> All class members have purportedly suffered an identical injury and their grievances are based on the same contention: they have been misclassified as exempt workers. And whether such misclassification has indeed taken place turns on the same factual and legal inquiry: whether their 'primary duty' is the performance of exempt work. … Moreover, as discussed below, the primary duty inquiry — which is central to all the class members' claims — is susceptible to common proof. … Therefore, the commonality requirement is met.… Hannaford's corporate policies and procedures — including training protocols, 'standard practice' materials, labor standards, scheduling systems, standardized pay ranges, and Kronos data — constitute sufficient common evidence to allow for class-wide adjudication. These resources will provide common answers about all the essential factors underpinning the 'primary duty' inquiry, including (1) the relative importance of fresh department managers' exempt duties as compared with other types of duties, (2) the amount of time fresh

1

department managers spend performing exempt work, (3) fresh department managers' relative freedom from direct supervision, (4) and the relationship between the salary of fresh department managers and the wages paid to hourly employees. Moreover, the evidence offered by Hannaford has not persuaded this Court that the differences in job responsibilities between fresh department managers are sufficient to discount the probatory significance of the common evidence submitted by Prinzo or otherwise prevent class-wide adjudication.

*Prinzo*, 343 F.R.D. at 252-53.[1]

As further described below, the record developed in this case is perhaps as extensive as has ever been put together for a mid-manager misclassification case. What the record shows – to use the language of what is perhaps the single most frequently cited decision regarding certification of a retail chain mid-manager misclassification class, is that, at Mariano's the "evidence is that the duties of the job are largely defined by comprehensive corporate procedures and policies," which is when, as that decision stated "district courts have routinely certified classes of employees challenging their classification as exempt, despite arguments about 'individualized' differences in job responsibilities." *Damassia v. Duane Reade, Inc.*, 250 F.R.D. 152, 160 (S.D.N.Y. 2008).[2] Specifically, the accompanying Appendix's comprehensive compilation of the record[3] demonstrates a huge panoply of ways in which DMs are similarly situated through common evidence that demonstrates, *inter alia*: that Mariano's classification

---

[1] *See also, e.g., Davis v. Charter Foods, Inc.*, No. 2:20-CV-00159-CEA, 2022 U.S. Dist. LEXIS 195498, at *43 (E.D. Tenn. Mar. 21, 2022) (certifying Rule 23 class on misclassification claims for all restaurant Assistant General Managers); *Goodman v. Burlington Coat Factory*, 2019 U.S. Dist. LEXIS 223588, at *48 (D.N.J. Nov. 20, 2019) (final certification of FLSA collective); *Rivet v. Office Depot, Inc.*, 207 F. Supp. 3d 417 (D.N.J. 2016) (certifying multiple state Rule 23 classes of retail store Assistant Managers on executive and administrative exemption defense); *Youngblood v. Family Dollar Stores, Inc.*, 2011 U.S. Dist. LEXIS 115389 (S.D.N.Y. Oct. 4, 2011) (Rule 23 certification of retail chain store managers).

[2] The Klafter Lesser firm was co-counsel in *Damassia* and can represent that the record in this case far exceeds what existed before then-District Court Judge Lynch in that case.

[3] Due to the extensive factual record, Plaintiffs have compiled an Appendix of all of the applicable factual evidence organized by separately enumerated evidentiary topic, which Plaintiffs will separately file. For ease of reference, Plaintiffs cite to that Appendix ("App'x") herein.

decision was done once, in 2016, on the basis of a thin, flawed review of just three DMs for each department and three store managers, and that Mariano's admits that all DMs are similarly classified as exempt notwithstanding any differences in store location, size or any other factor. S*ee* App'x 4, 6. Further, the evidence is overwhelming that Mariano's has common corporate and district/regional management and that is true for all stores (App'x 14), including that the stores are the same in all material respects (App'x 15), that there are common hiring practices for all DMs (App'x 16), and that all DMs are subject to common in-store hierarchy (App'x 17, 18); that all DMs were constrained to follow comprehensive corporate policies and procedures (App'x 19), including such thing as having to strictly follow planograms and automated ordering, production, and scheduling programs (App'x 20, 22); that Mariano's has uniform expectations of the DMs' job duties, including by using a uniform job description for all DMs, with only minor deviations for each department, providing uniform training to do their jobs (App'x 23) which allows them to transfer between stores without any retraining (App'x 24); that Mariano's uses uniform performance evaluation forms for all DMs (App'x 25); and that by affirmatively stating that all DMs have the same primary duties (App'x 26); that all DMs were expected to and did work at least 50 hours per week (App'x 28), and that Mariano's did not track or record the DMs' work hours (App'x 29) (and therefore cannot rebut the DMs' estimated hours worked (App'x 29-30)), then for purposes of calculating damages for all DMs, Mariano's based the DMs' salary on an expected 50 hour workweek (App'x 31); that DMs perform, as their primary duty, manual labor that is not in an office (App'x 32); that DMs perform retail sales and customer service work rather than business policy-making work (App'x 34); that Mariano's admits DMs work side by side with hourly workers doing the same tasks (App'x 35); that DMs do not have management as their primary duty and Mariano's could not even estimate the

3

percentage of time they perform alleged "management" duties (App'x 38), and that instead corporate, district, regional, and in-store managers above DMs in the store hierarchy actually perform those management duties (App'x 39); that an in-store Personnel Service Manager ("PSM") is responsible for all Human Resource ("HR") functions at Mariano's, including, but not limited to, activities related to interviewing, hiring, disciplinary action, promoting, and training new employees (App'x 40); that DMs are constrained in scheduling by corporate-issued labor budgeting and sales plans which they had no input into (App'x 41), and infrequently assigned tasks, directed the work of or coached hourly employees (App'x 46, 48); that DMs exercise little, if any, discretion and independent judgment and not as to matters of significance (App'x 51), and instead are closely supervised with little discretion, authority, or even input (App'x 52); and that even any alleged exempt duties that DMs perform are often performed by hourly employees, including scheduling and ordering product. (App'x 55).

## PROCEDURAL HISTORY

On November 9, 2020, the Court granted Plaintiffs' motion to conditionally certify a collective of meat and bakery managers in *DePyper*. ECF No. Notice was sent, and at present the collective consists of 28 named and opt-in plaintiffs. Hilbert Dec. ¶ 4. After the *Pletsch* case was filed on April 21, 2022, and was reassigned to this Court because of its relation to the *DePyper* case (*Pletsch* ECF 16), the parties stipulated to conditional certification of a collective of deli and hot foods managers, which the Court adopted on June 24, 2022. *Pletsch* ECF 24. Notice was sent, and the *DePyper* collective now consists of 76 named and opt-in plaintiffs. Hilbert Dec. ¶ 5.

After the *Pletsch* case was reassigned to this Court, the parties agreed to the consolidation of the *DePyper* and *Pletsch* matters, that discovery would proceed on a representative basis, and that the parties would select ten (10) representative discovery opt-ins in each of the two cases.

4

*DePyper* ECF 86; *Pletsch* ECF 21. The representative discovery opt-ins were chosen by each party choosing three plaintiffs in each case, and the remaining plaintiffs being chosen randomly. *Id.* The parties additionally agreed that the discovery conducted in a prior related case, *Kujat v. Roundy's Inc.,* Case No.1:18-cv-05326, could be used in these consolidated cases.

Discovery proceeded and – most significantly – Defendants elected to depose only 15 of the 20 representative discovery opt-ins they were entitled to depose. Plaintiffs took a Rule 30(b)(6) deposition of Defendants which included two corporate designees who were deposed over the course of four days. Additionally, Defendants produced tens of thousands of documents.

Following the close of discovery, the parties are now simultaneously briefing Plaintiffs' motions for final FLSA collective certification and Rule 23 certification and Defendants' motion to decertify the conditionally certified collectives before the summary judgment phase.

## STATEMENT OF FACTS

Named Plaintiffs David DePyper, Kate Milashus, and Sherie Pletsch, like all DMs, worked for Mariano's grocery stores in salaried Meat, Bakery, Deli, and Hot Foods Manager positions internally classified and paid by Defendants companywide as exempt from state and federal overtime laws. App'x 36. Defendants (or "Mariano's") are wholly owned subsidiaries of Kroger that owned and operated Mariano's grocery stores at all times covered by the class period definition.[4] Kroger operates over 2,700 grocery stores in 35 states under various banners, one of which is Mariano's with 44 stores[5] exclusively located within Illinois.

In addition to the summary of much of the evidence above at pages 2-3, the following facts are in the record: the fifteen (15) deposed DMs' were assigned to work as DMs at 30 of

---

[4] *DePyper* and *Pletsch* Corporate Disclosures. ECF Nos. 14, 15.
[5] https://s202.q4cdn.com/463742399/files/doc_financials/2023/ar/annual-report-to-security-holders.pdf (Item 1: Stores).

Mariano's 44 stores; they filled in at nine (9) additional stores on a short-term basis while working as DMs; and were assigned to five (5) additional stores while working in non-DM positions either as hourly team members or other managers. App'x 1. When the DMs were transferred between stores they did not need to be retrained, and they could easily fill in at other stores when needed without any additional training. App'x 16, 24 (*e.g.* a DM working at one store could transfer to another, and bench manager working one store could be placed as DMs at another store, without having to be retrained "because the stores are the same and run the same." The DMs also testified that they were required to attend weekly telephone meetings held by the district merchandiser for their department, which were attended by all DMs of the given department within the district, and during which they were given uniform information and instructions regarding the department that applied to all stores. App'x 20. And many of the DMs also testified that they communicated with DMs at other stores either via text, telephone, or because they physically went to other stores either to get material from the store or because they went to other stores to help out. App'x 3. All of this evidences that the representative discovery Plaintiffs have knowledge not only of their own job duties, but of the job duties of all DMs at all Mariano's stores.

### 1. Plaintiffs Performed Substantially Similar Job Duties.

Common evidence provides common answers to DM job duties and responsibilities. Defendants used a uniform job description for each DM position[6], none of which varied from other departments in substantive or material detail, and which required DMs to deliver a positive shopping experience and "incredible Customer Service," follow and comply with all company

---

[6] Note, however, that whenever one of the deposed plaintiffs was presented with a copy of the job description, they uniformly denied that it was an accurate representation of what they did, or were expected to do, on a daily basis. App'x 37.

policies and procedures and all regulations, handle sales transactions, work while "regularly required to sit stand, and use the hands[,]…frequent walking[ and ]lifting of up to 50 pounds[,]"[7] and which list the same minimum education and training requirements.[8] App'x 23. DMs are hired the same way (App'x 16), trained the same way and required to follow the same training modules, with task-oriented training focused on manual work (App'x 19, 24), reviewed on performance using same template (App'x 25) with performance measured by the same department and store sales metrics. *Id.*

Plaintiffs and Mariano's agree that all DMs work side by side with hourly associates (App'x 35), primarily involving manual labor not in an office (App'x 32), performing their same non-exempt job tasks (*id.* ), and have the shared goal of grocery sales. App'x 36. The parties just disagree on whether those actual duties are their primary duties under the exemptions asserted. Plaintiffs contend their primary duty – the reason they have the DM position, rather than one of Mariano's other "managerial" positions of People Services Manager ("PSM") or Assistant Store Managers ("ASM") or Service Operations Manager ("SOM") or Co-Manager or Store Manager or working in corporate/district/regional positions - is shared among all DMs: grocery sales and related customer service, including cleaning, stocking, merchandising, displaying, preparing, and providing the grocery items Mariano's sells. App'x 36. Mariano's explicitly attests that all DMs have the same shared primary duty for exemption analysis (App'x 4), but its designated

---

[7] *Cf., Tonyan v. Dunham's Athleisure Corp.*, 966 F.3d 681, 688 (7th Cir. 2020) ("Every consideration points to physical tasks as essential functions of [retail store manager] Tonyan's job. [The] job descriptions in the record…list physically demanding tasks as essential functions.")

[8] And, incredible as it is, Defendants still maintain a "professional exemption" defense – where DMs' "primary duty must be the performance of work requiring advanced knowledge in a field of science or learning customarily acquired by a prolonged course of specialized intellectual instruction" – yet every DM job similarly contains an express non-exempt requirement providing common answers: "High school education and five years experience in the supermarket industry, with participation in a management training program, or equivalent combination of education and experience required." App'x 25.

corporate representative's only articulated factual basis for supporting the exemption is its expectation that DMs instead spend "more than 50 percent of the time doing some level of managerial work,...leading and training, directing the workforce, scheduling staff, having involvement in hiring and promotability of their team." App'x 6. Mariano's attempts to get to "more than 50%" by simply recharacterizing DMs' performance of non-exempt tasks as constituting being a duty of "directing the workforce" because Mariano's "expect[s]" there will always be an hourly-paid co-worker audience when they do them.[9] App'x 38. Not only does this corporate expectation constitute a plainly common issue, but DM's, however, testified to the contrary: that they rarely monitored or coached hourly employees, often because they were either doing work where they could not even see those hourly employees (*i.e.* breaking down a load on the delivery dock or working in a freezer) or because the work they were doing made it unsafe or inappropriate for them to watch over those hourly employees (*i.e.* slicing meat or frying chicken). App'x 48.

Regardless, Mariano's claims that the exemptions for which it carries the burden of proving were all met in the same way by the DMs, because they all had those same primary duties and there is no difference in the facts that mattered for the exemptions between the different DMs, or between stores. App'x 4, 12. Again, the issue is a common issue for common adjudication.

### 2. Mariano's Uniformly Classified All DMs As Exempt in 2016.

Mariano's itself treated (and still treats) all DMs as a homogenous group for which no individualized inquiry is required to determine whether the positions are exempt. It uniformly

---

[9] "[Plaintiff] considers these activities as "selling," while other ASMs explain that they are always acting as a manager. At the class certification stage, the Court does not consider the merits of these two views." *Greko v. Diesel U.S.A., Inc.*, 277 F.R.D. 419, 428 (N.D. Cal. 2011) (certifying misclassification case).

classified as exempt all DMs as a group in 2016 based on its belief that all had the same shared primary duty regardless of department, or store, or any other variable. App'x 12. It did so based on one HR executive – VP of HR Christa Bertolini – allegedly talking to three department managers for each department, and going over a FLSA fact questionnaire form with three Store Directors who supervised those positions. Bertolini then completed that questionnaire herself – a representative fact-gathering that it attests was sufficient for accurately determining an exemption classification. App'x 5. In considering and recommending retention of the exemption classification in 2016, Mariano's did not rely on advice of counsel, did not look at any court decisions or case law, and was unable to locate the only document or record of any kind that allegedly existed – the handwritten notes purportedly left by Bertolini when she ceased employment in 2019 – reflecting decision-maker Ms. Bertolini's analysis, review of applicable DOL rules or regulations, and/or facts considered. App'x 60. But when Kroger announced that it wanted Mariano's classification of DMs to mirror its retail structure that classified those department positions as non-exempt, something that Mariano's executives recognized would cause Mariano's President Don Rosanova to "blow a gasket," VP of HR Bertolini and President Don Rosanova cut out all Kroger or Roundy's executive or counsel involvement, refused to consider their ongoing fact-finding and/or legal analysis, and sequestered sole decision-making to only those two individuals themselves (a decision once made that was rubber-stamped as final by them and two Mariano's V.P.s). App'x 7. The thin nature of the review could be of material importance as to the common FLSA issue of Mariano's state of mind to show willfulness and to show that Mariano's lacked "good faith" in its classification decision.[10]

---

[10] At a collective trial of assistant store managers misclassification claim against Staples, for instance, a company executive's similarly thin investigation was found by the court to support the jury's collective action plaintiff's verdict. _See Stillman v. Staples, Inc._, No. 07-849 (KSH), 2009 U.S. Dist. LEXIS 42247 at *46-48 (D.N.J. May 11, 2009).

At no time in eight years since making that uniform decision in 2016 did Mariano's ever engage in any review of or otherwise consider its exemption classification of those positions. (Stipulations [ECF 116], ¶ 1; App'x 8) Not only did it never revisit whether each paycheck over eight years was denying overtime to DMs contrary to the law, Mariano's never did any audit of these positions' job duties, or time studies related to those duties, or any other analysis or investigation of any kind to determine for itself the job duties and tasks that DMs *actually* performed during the relevant period. (Stipulations [ECF 116], ¶ 7; App'x 9) Moreover, it never did any analysis or consideration of any kind to determine whether the job descriptions for the positions, materially unchanged since before 2016, accurately reflected the job duties and responsibilities actually performed. *Id.* And without being able to explain how it knows this to be true, having steadfastly avoided doing any analysis to determine it, Defendants nonetheless contend that the job descriptions accurately reflect the company's *expectations*, but admit to knowing that DMs' job descriptions have not accurately reflected the job duties, tasks and responsibilities that DMs *actually performed* throughout the relevant period. App'x 10-11.

"All Mariano's are the same." App'x 15. Mariano's admits it did not, and would not, make any analysis of DM exemption store-specific based on any differences such as layout or two-story structure, or square footage, or size, or complexities, or location, or whether it is within or outside an urban area, or any other variation between Mariano's stores. *Id.*

The work of all DMs is governed by the same corporate hierarchy, from Kroger's 6,000 corporate office employees through Roundy's hundreds of corporate, district and regional management above store level. App'x 14. Those corporate and management personnel above store level had as their respective primary duties handling HR, recruiting, leaves of absence, benefits, merchandising (purchasing, vendor selection), store sales targets, labor budgets, health

and safety compliance, sanitation, regulatory compliance, legal, auditors, pricing, recipes and planograms, policies and procedures, quality control, loss prevention, insurance, payroll, accounts payable and receivable, and information technology. App'x 39.

All DMs are supervised, and constrained, by the same in-store hierarchy, with all stores having a Store Director (a/k/a Store Manager ("SM"), above one or more Co-Managers ("Co-Ms"), above two to four ASMs, SOMs at equivalent hierarchical level to ASMs, and PSMs, also at an equivalent hierarchical level to SOMs and ASMs as PSMs relates to DMs which were below those positions. App'x 18. Those higher-level in-store management job descriptions show that the store-level management duties and responsibilities Defendants wish to attribute as DM primary duties are instead the primary duties of in-store management positions above DMs that – unlike DMs – are not expected to perform grocery sales-related tasks. App'x 39. All DMs were constrained by corporate's tight labor budgeting and staffing levels. App'x 19.

DMs are similarly supervised, and constrained, by management above store level. The district/regional/corporate positions above store level, have as their primary duty the functional areas regarding management of store personnel and exercise of discretion in matters of significance that Defendants wish to attribute to DMs. App'x 39.

The Human Resources-focused in-store PSM position itself constitutes common evidence that PSMs have as their primary duty of personnel management, hiring and promotion of staff, scheduling, and training for employees in the store's departments. App'x 40. PSMs are expected to be performing those duties with 100% of their time, but none of the hourly associate grocery sales and services tasks; while a PSM may nonetheless chip in to assist department employees with their grocery sales and services related tasks, DMs do not ever chip in to assist PSMs with their PSM tasks. *Id.* PSMs do all pre-screening of applicants to work in perishables departments,

conduct all first level interviews, and make the decision whether to advance a candidate to a final level interview with the SM if the SM has not already ordered that. *Id.* They administer and manage completion of all training modules of perishables department employees.

Mariano's maintains uniform, comprehensive corporate policies and procedures that define the duties of the DMs and constrain – if not altogether eliminate – any independent discretion and judgment they may exercise, while prohibiting that as to any matters of significance. App'x 19, 51. Further limiting the independent discretion and judgment exercised by the DMs, DMs were given planograms from the district merchandiser describing how the department was required to be laid out, specifically identifying the specific products to be placed in any spot on any shelf or table, and the DMs testified that they had very little, if any, authority to deviate from that planogram. App'x 20.

Mariano's also had and has automated ordering and production tools it uses at all stores that direct the DMs on the amount of product to order and/or produce on any given day, which the DMs also testified they had little, if any authority to deviate from without first obtaining permission from a higher-level manager, which further limited the discretion and judgment they exercised in both ordering product for the department and producing any product sold in the department. App'x 21-22.

The same limitations to the DMs independent judgment and discretion was also true for scheduling. Mariano's had and has a scheduling program in place that automatically produces a schedule based on the budgeted number labor hours assigned to the department for the given week and on the employees' provided availability. The DMs testified that they ran this program and then created a draft schedule, which they then had to submit to either a higher level manager

or the PSM, who then either made changes directly to the schedule or directed the DM to make changes to the schedule. App'x 53.

Mariano's uniform training for, and performance evaluation templates of, DMs demonstrate common evidence that their job is the same regardless of department or store location. App'x 25.

All DMs were expected to work a minimum 50 hours/week; a common offer letter used by Mariano's for DM positions even stated that 50 hour minimum work hours expectation in writing. App'x 28. Corporate required DMs to be scheduled for 50 hours each week, and Mariano's does not have any knowledge of any time that a DM was ever scheduled for less than 50 hours/week (not counting PTO or other scheduled leave days). *Id.* Nor does the company have any knowledge of any time a DM ever worked less than 50 hours/week in a non-PTO/leave day week; indeed, Defendants admit it knew DMs worked more than 40 hours every week except for weeks when they took approved PTO/leave time. *Id.* This was confirmed by the DMs, who each testified that they never worked less than 50 hours a week, but often worked many more. *Id.*

SMs, Co-Ms, ASMs, and SOMs had "total store responsibility" – something Defendants admit DMs never had. App'x 18. If DMs didn't perform the "management"-type tasks Defendants attribute to them, the grocery stores would not cease to function. *Id.* [11]

Defendant's DM schedules, while flawed by failing to show all SM schedules, demonstrate the frequency with which DMs worked shifts under supervision of higher-level in-store management (SMs, Co-Ms, ASMs, SOMs, and PSMs). Hilbert Dec. ¶ 8.

---

[11] *Cf., Rieve v. Coventry Health Care, Inc.*, 870 F. Supp. 2d 856, 873 (C.D. Cal. 2012) ("Just as a retail clothing store cannot function without a store manager, nor can it function without salespeople."); *Carlisle v. Dolgencorp, Inc.*, No. 1:10-cv-490-WTL-MJD, 2012 U.S. Dist. LEXIS 65123, at *21-23 (S.D. Ind. May 9, 2012) (even where a Dollar General store would cease to function without its Store Manager, the company's tight labor budgeting resulting in the manager's performance of manual labor being most important to the success of the company).

All DMs are paid the same way: as salaried with no overtime pay, within corporate-dictated salary pay bands, all above the minimum salary threshold. App'x 60. Because every Collective Bargaining Agreement ("CBA") in effect at Mariano's throughout the period dictated the pay rates, overtime hours, and additional premium payments for all hourly-paid workers in those departments, common evidence answers the comparison – required for analysis of whether management was a primary duty under 29 C.F.R. § 541.700 -- of DM pay for their required 50 hour weekly work hours to the earnings for those same hours worked by the highest-paid hourly workers in each department. App'x 57.

And unlike other manager misclassification cases where the employer argues managers could not have performed non-exempt tasks because it negotiated a CBA barring anyone but union members (all of whom are below manager-titled positions) from performing the bargaining unit work tasks,[12] this case presents the opposite fact unifying the class: Defendants' negotiated CBAs all explicitly stated that "All position exclusions set forth in Article IB above [the provision excluding all management titled positions from being subject to the union contract] *shall be permitted to perform bargaining unit work as part of their duties*." App'x 33. (emphasis added). And unlike other CBAs,[13] Defendants' negotiated CBA gave DMs no role in the union grievance process. App'x 44.

---

[12] See *Haas v. Behr Dayton Thermal Prods., LLC*, No. 3:07cv139, 2008 U.S. Dist. LEXIS 122184, at *62-63 (S.D. Ohio Dec. 22, 2008) ("Defendant argues that several facts indicate that the management duties performed by the Plaintiffs are their "primary" duties. Principally, it points to the fact that the collective bargaining agreement prohibits the Plaintiffs from performing the 'nonexempt' work of producing parts.").

[13] *Id.*, at **52, 68 (defendant relied for management as primary duty on fact that plaintiff managers resolved grievances as the first step in the formal grievance process).

## ARGUMENT

### I.     The Applicable Rule 23 Standards

On the ultimate merits, Defendants bear the burden of proving that DMs were exempt under the IMWL, as under the FLSA's same exemption analysis. *Lukas v. Advocate Health Care Network & Subsidiaries*, No. 1:14-cv-2740, 2015 U.S. Dist. LEXIS 109851, at *6 n.1 (N.D. Ill. Aug. 19, 2015). For the present motion, it is Plaintiff's burden to show he propriety of class certification by a preponderance of the evidence. *Bell v. PNC Bank, N.A.*, 800 F.3d 360, 373 (7th Cir. 2015). "[T]he law gives broad leeway to district courts in making [class certification] decisions." *Amchem Prods. v. Windsor*, 521 U.S. 591 (1997). For class certification, the issue is not whether plaintiffs or defendants will be able to prove the elements on the merits, but only whether the proof will be common for all plaintiffs, win or lose. *Carpenters Pension Tr. Fund for N. Cal. v. Allstate Corp.* (*In re Allstate Corp. Sec. Litig.*), 966 F.3d 595, 604 (7th Cir. 2020). "If there are material factual disputes that bear on the requirements for class certification, the court must 'receive evidence if only by affidavit and resolve the disputes before deciding whether to certify the class.'" *Bell*, 800 F.3d at 377.

As to the Rule 23 criteria, a party seeking class certification must meet all the requirements of Rule 23(a) and at least one of the alternative requirements of Rule 23(b). Rule 23 requires "numerosity, commonality, typicality, and adequacy." Fed. R. Civ. P. 23. In addition, Plaintiffs must meet the requirements Rule 23(b)(3), which means they must demonstrate that class litigation is superior to individual litigation and that common questions predominate over individual ones. *Messner v. Northshore Univ. HealthSystem*, 669 F.3d 802, 811 (7th Cir. 2012).

15

Importantly, Rule 23 does not require a court to inquire into the merits of the plaintiff's suit when deciding whether to certify a class. *Id.* ("the court should not turn the class certification proceedings into a dress rehearsal for the trial on the merits.") . The question for a court is not whether the plaintiff has stated a cause of action or will prevail on the merits, but rather whether the requirements of Rule 23 are met. *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 164 (1974). A court may not reach the merits of an issue unless it is necessary to resolve the prerequisites of Rule 23 . *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 349-52 (2011).

### A. **Rule 23(a) 's Requirements are Met**

#### 1. **Numerosity under Rule 23(a)(1)**

Numerosity is satisfied here. Mariano's operated over 40 stores at all times during the relevant class period, each containing at least one exempt manager in each of its Bakery, Deli, Hot Foods, and Meat departments. App'x 63. In fact, the latest class list produced by Defendant shows approximately 547 individuals worked in the class positions during the relevant period. App'x 63. Numerosity is met.

#### 2. **Commonality under Rule 23(a)(2)**

There can be little question that commonality is met here. Rule 23(a)(2) requires that "questions of law or fact" be "common to the class." Commonality requires the identification of an issue that by its nature "is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011). Even a single common issue is sufficient to establish commonality. *Id.*, at 359. The critical point is "the need for *conduct* common to members of the class." *In re IKO Roofing Shingle Prods. Liab. Litig.*, 757 F.3d 599, 602 (7th Cir. 2014). "Where the same conduct or practice by the same defendant gives rise to the

same kind of claims from all class members, there is a common question." *Suchanek v. Sturm Foods, Inc.*, 764 F.3d 750, 756 (7th Cir. 2014). The common questions present in this misclassification case, as in many others, include such questions as whether Marianno's (a) has failed and/or refused to pay Plaintiffs and the Class overtime pay for hours worked in excess of 40 hours per workweek within the meaning the IMWL; (b) the nature and extent of class-wide injury and the appropriate measure of damages for the Class; and (c) whether Defendants have a policy of misclassifying DMs as exempt from coverage of the provisions of the IMWL. Here, all DMs assert the same claim (unpaid overtime) under the same law (IMWL) caused by the same uniform company policy (misclassified, as one homogenous group, as exempt) and conduct (requiring all DMs to regularly work overtime). That satisfies commonality. *See, e.g., Kramer v. Am. Bank & Tr. Co., N.A.*, No. 11 C 8758, 2017 U.S. Dist. LEXIS 48360, at *12-13 (N.D. Ill. Mar. 31, 2017) ("[w]ith regard to the IMWL claim, the class members have clearly suffered the alleged same injury because Defendants classified every [class member] as employees who are exempt from …overtime laws[; a] question of law common to the IMWL class claims is thus whether Defendants' classification was proper[…which] determination will be based on common proof regarding the nature of the work loan officers performed for the [employer].").[14]

---

[14] *See also, e.g, Kurgan v. Chiro One Wellness Ctrs. LLC*, No. 10-cv-1899, 2014 U.S. Dist. LEXIS 20255, at *24-25 (N.D. Ill. Feb. 19, 2014) (granting Rule 23 certification: "Defendants' classification of CTs as exempt was made at the corporate level…[additional] evidence [shows] that Chiro One's locations have a standardized hierarchy and that Chiro One had standardized corporate policies and procedures governing these employees and uniform training programs for these employees.[Cit.] Where there is evidence that the duties of the job are largely defined by comprehensive corporate procedures and policies, district courts have routinely certified classes of employees challenging their classification as exempt. Here, commonality is established."); *Gunn v. Stevens Sec. & Training Servs.*, No. 17-cv-06314, 2019 U.S. Dist. LEXIS 100868, at *9 (N.D. Ill. June 17, 2019) (certifying class on common issue of whether all were misclassified as independent contractors); *Prinzo*, 343 F.R.D. at 252 ("Here, Prinzo defines a class with sufficient common elements to warrant certification. All class members have purportedly suffered an identical injury and their grievances are based on the same contention: they have been misclassified as exempt workers. And whether such misclassification has indeed taken place turns on the same factual and legal inquiry: whether their 'primary duty' is the performance of exempt work."); *Youngblood v. Family Dollar Stores, Inc.*, 2011 U.S. Dist. LEXIS 115389, at *8 (S.D.N.Y. Oct. 4, 2011)

### 3. Typicality under Rule 23(a)(3).

So, too, with typicality.[15] This requirement "directs the district court to focus on whether the named representatives' claims have the same essential characteristics as the claims of the class at large." *Retired Chi. Police Ass'n v. City of Chi.*, 7 F.3d 584, 597 (7th Cir. 1993). Plaintiffs satisfy the typicality requirement when their claims arise "from the same event or practice or course of conduct that gives rise to the claims of other class members and is based on the same legal theory." *Muro v. Target Corp.*, 580 F.3d 485, 492 (7th Cir. 2009). Typicality "may be satisfied even if there are factual distinctions between the claims of the named plaintiffs and those of other class members," provided that "the named representatives' claims have the same essential characteristics as the claims of the class at large." *McFields v. Dart*, 982 F.3d 511, 518 (7th Cir. 2020) (citations omitted, cleaned up). The evidence set forth above and in the Appendix, including the numerous citations to the testimony of the named Plaintiffs and the admissions and evidence of Mariano's policies and practices shows how the named Plaintiffs claims are certainly typical of that of other DMs, as would be the legal claim arising from that evidence. *See Kurgan*, 2014 U.S. Dist. LEXIS 20255, at *26 ("Plaintiffs' claims and the claims of all potential class members arise from the same course of action by Defendant: the misclassification and the alleged failure to pay overtime. Further, the claims of Plaintiffs and the

---

(certifying retail chain misclassification case because "Plaintiffs' case raises several questions of law or fact common to the class, *see* Fed. R. Civ. P. 23(a)(2), including, among others, 'whether [Family Dollar store managers] are exempt from NYLL overtime requirements because they perform either 'executive' or 'administrative' duties'").

[15] While typicality is closely related to the commonality inquiry, *Keele v. Wexler*, 149 F.3d 589, 595 (7th Cir. 1998), the distinction between the two is that "the commonality inquiry focuses on what characteristics are shared among the whole class while the typicality inquiry focuses on the desired attributes of the class representative." *Howard v. Cook Cty. Sheriff's Office*, 989 F.3d 587, 606 (7th Cir. 2021).

potential class also arise from the same legal theory: an alleged violation of the IMWL. The typicality requirement has been satisfied.").

4.      **Adequacy under Rule 23(a)(4)** .

Under Rule 23(a)(4) , the class representative must fairly and adequately protect the interests of the class. The adequacy inquiry under Rule 23(a)(4) serves to uncover conflicts of interest between named parties and the class they seek to represent. *Amchem Prods.*, 521 U.S. at 625. The adequacy requirement involves two inquiries: "(1) the adequacy of the named plaintiffs as representatives of the proposed class's myriad members, with their differing and separate interests; and (2) the adequacy of the proposed class counsel." *Gomez v. St. Vincent Health, Inc.*, 649 F.3d 583, 592 (7th Cir. 2011); see, *e.g.,* P*atzfahl v. FSM Za, LLC,* No. 20-cv-1202, 2022 U.S. Dist. LEXIS 230073, at *8 (E.D. Wis. Dec. 19, 2022) (adequacy met where plaintiff had "the same interest and injury as the other members" and "diligently prosecuted th[e] case.").

The named plaintiffs have vigorously pursued this case and worked in all four of the exempt-paid perishables department manager positions at issue, were subject to the same conditions of employment, and have "the same interest and injury" as the proposed class. *Lofton v. Eym Pizza of Ill., LLC*, No. 18-cv-5743, 2024 U.S. Dist. LEXIS 150917, at *8-9 (N.D. Ill. Aug. 22, 2024). They have worked with counsel on this case, given deposition testimony, and nothing indicates that any class representative has any conflict of interest with the other members of the proposed class. See *id.* Class counsel, in turn, are highly experienced wage and hour class and collective action litigators that have litigated many mis-manager misclassification cases in various jurisdictions, satisfying the second adequacy inquiry. Hilbert Dec. ¶¶ 9-19. Adequacy is therefore met.

**B.** **Rule 23(b)(3) 's Requirements are Met.**

Rule 23(b)(3) is met where common questions of law and fact predominate over individualized questions, and where a class action is superior to other available methods of resolving the controversy.

### 1. Common Questions Predominate.

In cases alleging unpaid overtime resulting from a uniform corporate policy, questions of "commonality and predominance overlap in ways that make them difficult to analyze separately." *Bell*, 800 F.3d at 374. A "common question predominates over individual claims if a failure of proof on the common question would end the case and the whole class will prevail or fail in unison." *Id.*, at 378 (citations omitted). "The mere fact that not every issue is 'amenable to common resolution' does not necessarily defeat predominance, even if 'individual inquiries may be required after the class phase.'" *In re Hair Relaxer Mktg. Sales Pracs. & Prods. Liab. Litig.*, 2024 U.S. Dist. LEXIS 175590, at *590 (N.D. Ill. Sep. 27, 2024) (Rowland, J.) (citation omitted); *Kurgan v. Chiro One Wellness Ctrs. LLC*, 2014 U.S. Dist. LEXIS 20255 at *30 ("where liability can be established as a common issue, individualized damage issues do not necessarily preclude certification…. [T]he presence of individualized questions regarding damages does not prevent certification under Rule 23(b)(3)) (citing and quoting *Butler v. Sears, Roebuck & Co.*, 727 F.3d 796, 801 (7th Cir. 2013); *Messner*, 669 F.3d at 815)).

In short, "The guiding principle behind predominance is whether the proposed class's claims arise from a common nucleus of operative facts and issues." *Beaton*, 907 F.3d at 1029 (citing *Messner*, 669 F.3d at 815). This is because predominance is not determined "simply by counting noses: that is, determining whether there are more common issues or more individual issues, regardless of relative importance." *Butler*, 727 F.3d at 801. The Court need not find that

common questions predominate as to each element of their claim, or as to every prong of every exemption and every merits or damages issue – it need only determine whether common questions predominate as to one or more central issues. _Costello v. BeavEx, Inc._, 810 F.3d 1045, 1060 (7th Cir. 2016). "Rule 23(b)(3)…does not require a plaintiff seeking class certification to prove that each element of her claim is susceptible to classwide proof. What the rule does require is that common questions predominate over any questions affecting only individual class members." _Amgen Inc. v. Conn. Ret. Plans & Tr. Funds_, 568 U.S. 455, 469 (2013) (cleaned up). "The fact that the plaintiffs might require individualized relief or not share all questions in common does not preclude certification of a class." _Bell_, 800 F.3d at 379; _accord Beaton_, 907 F.3d at 1029.

Here, the predominant claim is, indeed, whether Defendants' uniform classification of DMs as exempt employees was proper or otherwise. And, as the _Prinzo, supra_ , court aptly stated, quoting the leading _Damassia_ decision, as to predominance, "[i]n misclassification cases, common evidence often takes the shape of corporate policies and procedures" and "[w]here . . . there is evidence that the duties of the job are largely defined by comprehensive corporate procedures and policies, district courts have routinely certified classes of employees challenging their classification as exempt, despite arguments about 'individualized' differences in job responsibilities." _Prinzo_, 343 F.R.D. at 253 (quoting _Damassia_, 250 F.R.D. at 160; and citing _Casias v. Distribution Mgmt. Corp._, No. 11-00874 MV/RHS, 2014 U.S. Dist. LEXIS 197250, at *41 (D.N.M. Mar. 31, 2014) ("in deciding whether an employer's uniform exemption policy is supported by common evidence . . ., one of the relevant inquiries is whether . . . the 'employer exercised some level of centralized control in the form of standardized hierarchy, standardized corporate policies and procedures governing employees, uniform training programs,

and other factors susceptible to common proof.'")). These words fully apply in this case given the evidence set forth above and on page after page after page of the Appendix which demonstrates common evidence as Mariano's classification decision, how it had standardized polices and procedures, common management, hiring practices, automated systems, labor budgets, a uniform job description, etc.

The Court of Appeals reached the same conclusion in *Ross v. RBS Citizens, N.A.*, 667 F.3d 900 (7th Cir. 2012), in upholding Rule 23 certification of a manager misclassification class. While no longer precedential, the decision is certainly persuasive.[16] There, because the evidence showed "that a company-wide policy in Illinois requires ABMs to perform non-exempt work [without overtime pay] in violation of the IMWL...[a]lthough there again might be slight variations in the exact duties that each ABM performs[,]..unofficial company policy compelled them to perform duties for which they should have been entitled to collect overtime[;…] an individualized assessment of each ABM's job duties is not relevant to a claim that an unlawful company-wide policy exists to deny ABMs overtime pay." *Ross*, 667 F.3d at 910. There, as here, "[u]ltimately, the glue holding together the ABM classes is based on the common question of whether an unlawful overtime policy prevented employees from collecting lawfully earned

---

[16] Following the *Ross* decision, it was vacated by a Supreme Court "G/V/R" order and remanded for consideration after the Court rendered *Comcast Corp. v. Behrend*, 569 U.S. 27 (2013), which, rendered *Ross* non-precedential under *McCaster v. Darden Rests., Inc.*, 845 F.3d 794, 799 n.5 (7th Cir. 2017). However, the circumstances of vacatur and remand do not negate its non-precedential persuasive value (*Bell*, 800 F.3d at 375 n.3): it was remanded to consider the *Comcast* issue of whether theories of liability and damages aligned, which are not an issue here. *See Kurgan*, 2014 U.S. Dist. LEXIS 20255 at *31-32 (addressing point: "Plaintiffs' theory of liability is that Defendant unlawfully refused to pay CTs overtime pay as required under the IMWL. '[T]here is no possibility in this case that damages could be attributed to acts of defendants that are not challenged on a class-wide basis;' all members of the class attribute their damages to [defendant's] decision to classify them as exempt." (Quoting *Butler*, 727 F.3d at 800). The *Ross* vacatur did not lead to a further decision because the case settled, and *Ross* has continued to be cited within the Circuit. *See Bitner v. Wyndham Vacation Resorts, Inc.*, No. 13-cv-451-wmc, 2016 U.S. Dist. LEXIS 179661, at *19 (W.D. Wis. Dec. 28, 2016) (citing *Ross* in decision certifying class post-vacatur).

overtime compensation." *Id.* That such a conclusion is reached in misclassification cases is hardly surprising given the plethora of common evidence that exists in many such cases -- and here in the form of the corporate policies and admissions addressed above – and, no less so, in the manner in which Defendants applied the exempt classification decision across the board – a determination it made in 2016, based on the thin review described above, and as to which it concedes it did not consider (or believe it necessary to consider) any variations between individuals, store management, or store size, location, sales volume, or other similar factors. App'x 6. Thus, in a leading Court of Appeals decision relating to managerial misclassification, *Morgan v. Family Dollar Stores*, 551 F.3d 1233, 1263 (11th Cir. 2008) (FLSA case), the court affirmed denial of FLSA decertification at the second stage because "even Family Dollar perceived no such distinction [between store managers company-wide]" since "it exempted all store managers from overtime pay requirements without regard to store size, sales volume, region, district, or hiring and firing authority.").[17] Here, Defendants relied on that classification decision in issuing every paycheck denying overtime to DMs in the 8 years since, and believes now (as it did then) that no individualized inquiry, and no investigation into actual duties worked, is required to defend its exemption. Rather, according to Defendants, all DMs meet the exemption in the same way. App'x 12. *See also, e.g., Charlot v. Ecolab, Inc.*, No. 18-10528 (KM) (MAH), 2019 U.S. Dist. LEXIS 217484, at *42-43 (D.N.J. Dec. 17, 2019) (granting Rule 23 class certification in misclassification case because, even where the defendant pointed to

---

[17] See also *In re Unum Grp. Corp.*, No. 23-0503, 2023 U.S. App. LEXIS 33512, at *6 (6th Cir. Dec. 18, 2023) ("Unum does not, for instance, suggest that it makes an individualized evaluation of the degree of independence and discretion exercised by each DBS—or even the various types of DBSs in combination with the [work they do]—before determining that a given DBS's primary duty classifies them as exempt."); *Kurgan*, 2014 U.S. Dist. LEXIS 20255 at *12 (certifying Rule 23 Illinois overtime misclassification class action, where employer "has always treated [position] as a cohesive group for the purposes of applying the FLSA[; i]t uniformly classified them as exempt from the FLSA, which, Plaintiffs allege, resulted in a systemic failure to maintain accurate records of the hours that CTs worked.

"granular differences" between sales by employees, "Ecolab's argument that individual issues predominate over common questions is, to a degree, undercut by its own corporate policy of classifying *all* RMs as exempt."; also finding predominance "because all of the RMs have similar job descriptions and responsibilities").

### 2. A Class Action Is a Superior Method of Adjudicating the Claims Here.

Rule 23(b)(3) also requires Plaintiffs to show that "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." The well-established justifications for superiority of class action treatment of unpaid overtime claims apply here, including mutuality of benefit from proceeding as a Rule 23 class,[18] avoiding wasteful relitigation in separate and individual lawsuits,[19] and avoiding inconsistent adjudications. Rule 23 sets forth a non-exclusive list of factors pertinent to inquiry into superiority, including: whether individual class members wish to bring, or have already brought, individual actions; the desirability of concentrating the litigation of the claims in the particular forum; and the difficulties of managing the case as a class action. There is the clear value of having the claims in a single court and no difficulties can be envisioned in managing this case, as opposed to the many similar cases that have been certified. And Plaintiffs are unaware of any individual interested in prosecuting separate actions, particularly given how the costs of litigating individual

---

[18] *See, e.g., Bell*, 800 F.3d at 379 (affirming class certification of IL unpaid overtime claims, finding *inter alia* superiority because proceeding as a class benefits defendants by providing a single proceeding in which to adjudicate claims that will bind all class members).

[19] *See, e.g., Lukas v. Advocate Health Care Network & Subsidiaries*, No. 1:14-cv-2740, 2015 U.S. Dist. LEXIS 109851, at *21-22 (N.D. Ill. Aug. 19, 2015) ("A class action is therefore superior to individual trials for each class member, in which the uniform legal issue of the []pay scheme's compliance with the FLSA and IMWL would be wastefully relitigated.").

claims would be swallowed up by the costs of litigation, even though the recoveries may not be insignificant.[20]

  Further, and no less importantly, "in the wage claim context, the opt-out nature of a class action is a valuable feature lacking in an FLSA collective action, insofar as many employees will be reluctant to participate in the action due to fears of retaliation." _Salim Shahriar v. Smith & Wollensky Rest. Grp., Inc._, 659 F.3d 234, 244 (2d Cir. 2011) ("[A]n employee fearful of retaliation or of being 'blackballed' in his or her industry may choose not to assert his or her FLSA right."); _O'Brien v. Encotech Constr. Servs._, 203 F.R.D. 346, 351 (N.D. Ill. 2001) ("[A] very important concern is the fear of retaliation for individual employees required to file individual claims," because the "nature of the economic dependency involved in the employment relationship is inherently inhibiting."); _Torres v. Gristede's Operating Corp._, 2006 U.S. Dist. LEXIS 74039, at *53-54 (S.D.N.Y. Sep. 28, 2006) (certifying class of grocery store department managers: "since some class members are still employees of Defendants', class members may fear reprisal and would not be inclined to pursue individual claims.").[21] A class proceeding is certainly superior.

---

[20] "For a single, potentially [exempt-]misclassified [Umpire], the impetus to sue [the USTA] for what might constitute a small economic return is minimal. _Meyer v. United States Tennis Ass'n_, 297 F.R.D. 75, 89 (S.D.N.Y. 2013)._

[21] Here, the superiority is also supported by the strong interest showed by the high rate of participation when given the Court-authorized opportunity to have their federal law overtime claims adjudicated collectively in a representative collective action – here, 16% and 41% of notice recipients opted-in to _DePyper_ and _Pletsch_, respectively. _While in Lofton_, 2024 U.S. Dist. LEXIS 150917, at *11, this Court was unpersuaded by defendant's arguments that superiority was lacking where a low number of potential class members opted in purportedly displayed lack of interest – there, only 6.5% of a 1,075 member potential class opted in to the collective action (12.7% if including opt-ins compelled to arbitration), here, the opt-in rates far exceed average engagement. _See Andrew C. Brunsden, _Hybrid Class Actions, Dual Certification, and Wage Law Enforcement in the Federal Courts_, 29 Berkeley J. Emp. & Lab. L. 269, 291-94 (2008)_ (surveying 21 opt-in FLSA cases and finding average participation rate to be 15.71%). This similarly shows that there is no vast disparity between the number of FLSA collective action opt-in plaintiffs and Rule 23 state law class members; regardless, even a large disparity would not defeat superiority. _Lofton_, 2024 U.S. Dist. LEXIS 150917, at *11-12.

### C. Alternatively, A Rule 23(c)(4) Issues Class Could be Certified

In the alternative, and out of an abundance of caution, if the Court disagrees that this case cannot proceed on a Rule 23(b)(3) class basis, Plaintiffs request Rule 23(c)(4) certification "with respect to particular issues."[22] The Court could "bifurcate the case into a liability phase and a damages phase," whereby the Court "determines liability on a classwide basis and then resolves individual damages by other means." *McMahon v. LVNV Funding, LLC*, 807 F.3d 872, 876 (7th Cir. 2015). Where resolution of a particular issue would be "driven predominantly by common questions" and resolution by class action is a superior way of handling the litigation, such a (c)(4) can indeed be proper, *Jacks v. Directsat USA, LLC*, 118 F.4th 888 (7th Cir. 2024), and here as set forth above, the core issue of the propriety of the misclassification decision, taken on a uniform basis by Defendants, presents a liability issue that could be certified, even if individualized issues might be contended to predominate.

## II. PLAINTIFF'S MOTION FOR FINAL CERTIFICATION OF THE FLSA COLLECTIVE SHOULD BE GRANTED

For much the same reasons and based upon the same evidence that supports certification of the Illinois wage claims, this Court should also grant final, trial certification of the FLSA collectives. The Court conditionally certified an FLSA collective in the *DePyper* matter on November 9, 2020 (*DePyper* ECF No. 37), and in the related *Pletsch* matter on June 24, 2022 (*Pletsch* ECF No.24). The *DePyper* Collective now includes 28 members, while the *Pletsch* Collective includes 76 members. Hilbert Dec. ¶¶ 4-5. The case is now at the second step of the

---

[22] *Butler v. Sears, Roebuck & Co.*, 727 F.3d 796, 800-01 (7th Cir. 2013) ("a class action limited to determining liability on a class-wide basis, with separate hearings to determine—if liability is established—the damages of individual class members, or homogeneous groups of class members, is permitted by Rule 23(c)(4) and will often be the sensible way to proceed…If the issues of liability are genuinely common issues, and the damages of individual class members can be readily determined in individual hearings, in settlement negotiations, or by creation of subclasses, the fact that damages are not identical across all class members should not preclude class certification..")

FLSA collective action certification process, and Plaintiffs now move for final certification of the conditionally certified FLSA collectives in both *DePyper* and *Pletsch*.[23]

### A. <u>Standard for FLSA Final Certification</u>

The Court should grant Plaintiffs' motion for final FLSA certification on two separate grounds: first, the Court should grant Plaintiffs' motion because Plaintiffs satisfy the higher standards for class certification under Rule 23 ; and second, the Court should grant Plaintiffs' motion because Plaintiffs separately satisfy the independent factors for final certification articulated by courts in this Circuit when performing a "second step" FLSA certification review. Under either, the extraordinarily extensive and fulsome record generated in discovery, as demonstrated in the Appendix and summarized at pages 2-3 and 5-15, above, makes clear that Plaintiffs satisfy the applicable standards.

> 1. *The Court Should Approve Final FLSA Certification Because Plaintiffs Satisfy the Standards of* Rule 23

Courts within this Circuit frequently forego a separate analysis for FLSA final certification where, like here, parties move concurrently for Rule 23 class certification and final certification under the FLSA. *Pietrzycki v. Heights Tower Serv.*, 197 F. Supp. 3d 1007, 1012-13 (N.D. Ill. 2016) ("when a court is deciding whether to certify a collective action and a class action in one lawsuit, the court treats them as 'a single class action' and applies 'the Rule 23 standards.'") (granting both Rule 23 class and FLSA collective certification after performing Rule 23 analysis only) (*citing Sanchez v. Roka Akor Chi. LLC*, No. 14-cv-4645, 2016 U.S. Dist. LEXIS 1542 (N.D. Ill. Jan. 7, 2016) (same)). Courts adopt this analysis in acknowledgement that final certification under the FLSA is a *lower bar* for plaintiffs to hurdle than is Rule 23 class

---

[23] At the second step, "the plaintiff can move for final, full certification of the collective action." *Slaaen v. Senior Lifestyle Corp.*, No. 18-CV-1562-JPS, 2019 U.S. Dist. LEXIS 61041, at *5 (E.D. Wis. Apr. 9, 2019).

certification; hence, when a party sufficiently satisfies standards for class certification, it necessarily meets the standards for FLSA final certification. *Lukas*, 2015 U.S. Dist. LEXIS 109851 at *22 ("Because Plaintiffs' proposed class meets the Rule 23 standards for class certification, it necessarily meets the much lower bar for FLSA collective action certification"); *see also Dennis v. Greatland Home Health Servs.*, 591 F. Supp. 3d 320, 330 (N.D. Ill. 2022) ("because certification under Rule 23 is proper here, decertification of the FLSA action would be improper," and any additional analysis is "unnecessary."). Here, as demonstrated in the preceding section, the record developed in discovery amply satisfies the standards for Rule 23 class certification, and, as such, FLSA final certification is also appropriate.

2. *Plaintiffs Satisfy the Criteria for FLSA Final Approval in this Circuit*

Even aside from the foregoing, were the Court to undertake a FLSA analysis, the Court would analyze whether members of the conditionally certified collective are in fact "similarly situated" under the FLSA. Inasmuch as the FLSA does not itself define "similarly situated," courts within this Circuit have adopted three factors for making the determination: "(1) whether the plaintiffs share similar or disparate factual and employment settings; (2) whether the various affirmative defenses available to the defendant would have to be individually applied to each plaintiff; and (3) fairness and procedural concerns." *Dennis*, 591 F. Supp. 3d at 330(citations omitted). In performing this analysis, courts have recognized that final certification of a collective action does not require that there be no differences among collective members; indeed, in exemption misclassification cases "some variances in individual employees' performance of responsibilities common to their positions are inevitable and insufficient to [preclude second stage certification]." *Hudgins v. Total Quality Logistics, LLC*, No. 16 C 7331, 2019 U.S. Dist. LEXIS 13793, at *12 (N.D. Ill. Jan. 29, 2019).

28

a.   Plaintiffs Share Similar Factual and Employment Settings

Plaintiffs are found to share similar factual and employment settings where there is "an identifiable factual nexus that binds the plaintiffs together as victims of a particular violation of the overtime laws, including 'polices or practices that bind the plaintiffs' claims together.'" *Dennis*, 591 F. Supp. 3d at 330 (*citing Camilotes v. Resurrection Health Care Corp.*, 286 F.R.D. 339, 346 (N.D. Ill. 2012)). Here, the evidence overwhelmingly demonstrates that similar practices and policies bind the DMs and their claims, and this factor supports final certification. As set forth in detail above, and in the many pages of the Appendix, the evidence of the common policies and practices is overwhelming, and just to (non-exhaustively) list a dozen: from (1) the Defendant's uniform classification of all DMs as exempt,[24] to (2) the uniform policy, as repeated by Defendant in every single offer of employment letter sent to DMs and produced in discovery, that all DMs are uniformly required to work a minimum of 50 hours a week (and, in fact, while DMs are in fact routinely *scheduled* to work 50 hours per week, the deposition testimony of every plaintiff is that on average they work far more – all without receiving any overtime premium); to (3) Defendants' common job description for all DM positions, with only minor, non-substantive variances, and which identically requires DMs to deliver "incredible customer service," to follow and comply with all company policies and procedures and all regulations, to handle sales transactions, and to perform work which requires routine standing, the use of the hands, and lifting heavy items (App'x 10-11), to (4) Defendants' identical job postings, regardless of the store location (App'x 16), to (5) the operational policies and processes that

---

[24] *See, e.g. Dennis*, 591 F. Supp. 3d at 330 (finding a uniform policy of classifying plaintiffs as exempt subjected them to "a similar factual and employment setting"); *see also Hudgins*, 2019 U.S. Dist. LEXIS 13793 at *4 (it is "probative that the entire FLSA [collective] was categorically classified as exempt from overtime pay…That policy suggests that the company itself views the [collective members] as similarly situated for purposed of overtime pay.")

direct DMs in how to perform their daily tasks that are identical across Marino's locations regardless of store location, or store size, or any other factor (App'x 18, 19, 40); to (6) how DMs are trained in the same manner, are taught to learn and memorize the same processes, and are told that the processes are to be completed as taught without variation (App'x 19, 24) such as the automatic ordering process and the manner in which preparing food requires strict adhesion to processes and recipes (App'x 21-22); to (7) the role of department "Merchandisers" whose role is to enforce uniformity across Mariano's locations, through weekly conference calls with area DMs, store visits, email updates, and by providing DMs with detailed, shelf-by-shelf, item-by-item instruction on what products are to be sold and how those products are to be organized and displayed (via "Plan-o-Grams," from which DMs may not deviate) (App'x 20); to (8) the telling evidence of how *all the 15 representative discovery plaintiffs Defendants deposed* identically testified that although they worked across multiple Mariano's locations, they required no new training upon moving to a new store; instead, the work and the manner in which they performed their work at any store was identical, and any DM could move to another location with no change to their daily routines – they simply had to follow the same plan they had already been following (App'x 19, 24); to (9) the hierarchical structure in which all DMs were supervised, and constrained, by having a Store Director (a/k/a Store Manager), one or more Co-Managers, and two to four ASMs – all of whom are above DMs (App'x 14); to (10) to how all Mariano's locations also employ PSMs – an HR position that manages all personnel decisions within any given Mariano's store so that DMs are similar in that they have virtually no role in hiring, interviewing, firing, or disciplining employees nor play no role in setting pay rates for hourly employees (App'x 40), to (11) the uniform testimony of how the labor budgets at the stores where they worked were routinely too small, and so the stores where they worked were routinely

understaffed which resulted in weekly schedules that did not assign enough hours to enough employees to complete the daily work that needed to be done –which mean that the work would ultimately, inevitably, fall to the DMs to complete (App'x 41); and to (12) to CBAs that demonstrate uniform treatment of DMs (App'x 60) (*see* above).

In short, the evidence – from corporate documents to the all-important discovery taken of the 15 representative discovery opt-ins is consistent: taken all together, DMs clearly shared "similar factual and employment settings." Here, a representative discovery process was taken involving depositions of each DM and that resulted in materially consistent testimony as to how each DM was micromanaged by the same policies and processes, overseen by merchandisers who policed their adherence to those policies, worked more than 40 hours a week on a weekly basis without overtime pay, had no responsibility for hiring, firing, disciplining, or evaluating hourly employees, spent the vast majority of their time preforming non-exempt manual labor, including moving product, helping customers, preparing food, and cleaning, all with little discretion or judgment in how to perform any task they complete on a daily basis. App'x 32. This is the exact kind of evidence that sufficed for the Court granting final certification, for instance, in *Goodman v. Burlington Coat Factory*, No. 11-4395 (JHR), 2019 U.S. Dist. LEXIS 223588, at *48 (D.N.J. Nov. 20, 2019), where in another retail chain store manager misclassification case involving almost an identical set of uniform corporate policies and practices, *see id.*, at *18-21, the court concluded that Plaintiffs had:

> demonstrated a factual nexus between the manner in which Burlington's alleged policy affected him and the manner in which it affected other Burlington ASMs. Specifically, the record evidence demonstrates that the ASMs all labored under uniform job descriptions, corporate policies and procedures, which include a uniform method of compensation and apply to all ASMs nationwide as set forth in Burlington's Rule 30(b)(6) designee's deposition.**52** The Plaintiffs spent a majority of their time performing [*32] non-exempt tasks, worked more than forty hours in a workweek, and did not receive overtime compensation.

*Id.*, at *31-32; *see also* id., at *43-44(also  citing other similar results in similar retail chain mid-manager misclassification cases).

          b.   <u>Defendants' Affirmative Defenses Do Not Require Individualized Application</u>

Further, FLSA final certification is further appropriate because Defendants' affirmative defenses do not require individualized application. At the outset, it should be noted that despite having designated 30(b)(6) corporate witnesses at three separate depositions, Defendant has not identified *any* facts to support *any* of its affirmative defenses, other than to point to its alleged and flawed one-time exemption classification review in 2016. App'x 4-7.  Although Defendants' Answers filed in the underlying proceedings included twenty-five and nineteen boilerplate affirmative defenses respectively, Defendants were unable – again, despite being given three opportunities to provide corporate representative 30(b)(6) testimony on the topic – to identify even one fact that the company relies upon in support of its kitchen sink of affirmative defenses other than conducting one classification review over 8 years ago, and has neither identified nor offered any evidence to support asserted defenses that any Plaintiffs' work was non-compensable or de minimis, or offset, or that any Plaintiffs will be unjustly enriched or have received benefits to which they are not entitled, or that Defendants took reasonable care, or that Plaintiffs failed to use preventative and corrective opportunities, or that Plaintiffs failed to follow policies, or that Defendants lacked constructive knowledge of overtime being worked, or that Plaintiffs have unclean hands or face estoppel, or that Plaintiffs violated any policies by failing to report time, or the existence of any arbitration agreements.

Accordingly, the only remotely plausible affirmative defense Defendant offers – that DMs are not misclassified – does not demand individualized application. Rather, that issue of

misclassification is the archetypical issue to be assessed through common evidence, as reflected in uniform policies and procedure and Mariano's uniform exemption of DMs as exempt, which demonstrate whether an employer exercised a level of centralized control in the form of standardized hierarchy, standardized corporate policies and procedures governing employees, uniform training programs, and other factors susceptible to common proof. This factor supports final certification.

Further, Plaintiffs are also similarly situated as to damages. Defendants concede all DMs were required to work over 40 hours every week, and the company knew they were working more than 40 hours every week except weeks when they took leave. App'x 28. Indeed, as noted, all DMs were required (even stated in their offer letters) to work a minimum 50 hours, and were regularly scheduled for a minimum 50 hours.[25] App'x 28. For the same reasons summarized above, proving damages does not preclude final collective certification. *See Hudgins*, 2019 U.S. Dist. LEXIS 13793 at *29-30 (denying decertification where, as here, the collective is small (low hundreds) and plaintiff proposed alternative accommodations for damages calculations); *O'Leary v. Humana Ins. Co.*, No. 17-C-1774, 2020 U.S. Dist. LEXIS 222782, at *22 (E.D. Wis. Nov. 30, 2020) (misclassification damages issues including lack of time records and "clear mutual understanding" determination do not preclude final certification).[26]

---

[25] See *Morgan*, 551 F.3d at 1254 (denying decertification of retail manager exemption misclassification case, on facts including all were required to work minimum 52 hours and regularly scheduled with 52 hours as a base).

[26] For FLSA cases, the determination of damages – given the lack of time records – is handled through a just and reasonable inference which can be determined by the jury's consideration of representative trial testimony. But even it appeared individual determinations were necessary, among many case management options a court could appoint a special master to "resolve a difficult computation of damages." *Alvarez v. City of Chi.*, 605 F.3d 445, 449 n.1 (7th Cir. 2010).

c.   <u>Uniform Evidence re: FLSA Willfulness and "Good Faith"
Defense</u>

Further, and particularly for the FLSA claims, there is yet another common factor true

collectively across all the opt-ins that supports trial on a collective basis: the nature of

Defendants' two "state of mind" defenses. First, under the FLSA, if plaintiffs can show that an

employer acted with willfulness, which can also mean recklessness (i.e., that the defendant

"knew or showed reckless disregard"), then a three-year statute of limitations applies. *Noe v.

Smart Mortg. Ctrs., Inc.*, No. 1:21-CV-01668, 2024 U.S. Dist. LEXIS 176268, at *38-39 (N.D.

Ill. Sep. 29, 2024) (citations omitted). Second, while the willfulness burden falls on the plaintiff,

in turn, unless the defendant can show that misclassified DMs in "good faith", then plaintiffs are

entitled to liquidated damages in an amount equal to their actual damages. 29 U.S.C. § 255(a);

*see also Stillman*, 2009 U.S. Dist. LEXIS 42247 at *78 (explicating point and discussing overlap

between the willfulness and good faith standards). To defend against Plaintiffs' willfulness and

good faith contentions, here, Defendants rely solely on one uniform exemption classification

determination process for all DMs in 2016 and concede the company did not engage in any

review, examination, or consideration of any kind whether its exemption decision remained

FLSA compliant or whether the DM exemptions claimed should be reconsidered at any time

since 2016. App'x 4-7. Plaintiffs' evidence that Defendants failed their obligation to monitor

compliance of its exemption classification for more than eight years thereafter, even after being

put on notice multiple times of matters that under applicable legal analysis reasonably should

have prompted inquiry and re-assessment, is similarly company-wide as to all DMs and requires

no individualized analysis. *See, e.g., Damassia*, 250 F.R.D. at 156. This further supports final

certification because whether Defendants "knew or showed reckless disregard" that DMs did not

satisfy the exemption, and whether it misclassified DMs in "good faith," will be adjudicated with

34

the exact same evidence (since the 2016 exemption determination, and subjective and objectively unreasonable failure to monitor its accuracy, was corporate-wide). Indeed, similar evidence to the thin investigation by Ms. Bertolini was a major point in plaintiffs obtaining a collective action trial verdict against Staples as to the parallel willfulness and good faith issues. *See Stillman*, 2009 U.S. Dist. LEXIS 42247 at *48 ("Given the limited information upon which the self-described "audit" was based and the superficial method used to collect the information, a reasonable jury could conclude that the audit was nothing more than minimal attempted compliance with the FLSA, and in light of other information upper management had concerning the tasks sales managers actually performed at the time of the 'audit,' a reasonable jury had sufficient evidence to find that the defendant 'showed reckless disregard for the matter of whether its conduct was prohibited by the FLSA.'") (*quoting Brock v. Richland Shoe Co.*, 799 F.2d 80, 81 (3d Cir. 1986)).

### d.  Fairness and Procedural Concerns Demand Final Certification

In misclassification cases, "because the central questions of liability hinge on an employers' policies, the employer's defenses will likely apply to collective members in the same manner...[a]nd because Defendants' liability and defenses are subject to collective resolution, it is preferable as a matter of fairness and judicial economy to proceed collectively." *Dennis*, 591 F. Supp. 3d at 331. As demonstrated with the preceding two factors, Plaintiffs share similar factual and employment settings, and there are no defenses and analysis that would require individualized application or otherwise impair the efficiency and economy of collective resolution. That makes this case an archetype for collective resolution, and the Court should grant Plaintiffs' motion for final certification.

35

Fairness concerns are especially satisfied where, as here, the defendant was allowed to select a portion of opt-ins to participate in representative discovery based on whatever preference or criteria it preferred. [27] In other words, with all its knowledge of the individuals who had joined the case that it had through their personnel history and the knowledge of Store Managers, PSMs, ASMs, and SOMs, Mariano's was in a position to cherry-pick those opt-ins that it best believedcould supports its case. Notwithstanding this opportunity, in all material aspects the representative opt-ins it chose for deposition corroborated the other selected discovery opt-ins on similarly situated fact issues. This substantially supports final certification. See, e.g., Smith v. Family Video Movie Club, Inc., No. 11 C 1773, 2015 U.S. Dist. LEXIS 43335, at *27 (N.D. Ill. Mar. 31, 2015) (fairness of FLSA final certification satisfied where defendant selected half of the 10% of total opt-ins selected for representative plaintiff depositions). But it even more emphatically supports final certification where the protocol allowed Defendants to depose 20 discovery Plaintiffs, but Defendants stopped at 15 and waived having another 5 opt-ins sit for depositions, demonstrating that Defendants did not wish to take any more discovery.

## CONCLUSION

Wherefore, for all the foregoing reasons, Plaintiffs respectfully request that the Court certify the requested class under Rule 23 (see page 1) and grant final certification of the *Pletsch* and *DePyper* collectives for trial.[28]

This 17th day of January, 2025.

Respectfully submitted,

*/s/ Seth R. Lesser*

---

[27] Under the agreed upon discovery protocol, Defendants selected 6 of the discovery opt-ins, Plaintiff selected 6, and the remaining 8 were selected at random, constituting 19% of 104 total opt-ins.
[28] Should the Court grant Plaintiffs' Motion, the parties will meet and confer with regard to a proposed plan of notice, including methods of service and approximate time for completion of service.

Seth R. Lesser*
Christopher M. Timmel*
KLAFTER LESSER LLP
Two International Drive, Suite 350
Rye Brook, NY 10573
Telephone: (914) 934-9200
Facsimile: (914) 934-9220
Email: seth@klafterlesser.com
       christopher.timmel@klafterlesser.com

C. Andrew Head (IL 6318974)
Bethany Hilbert (IL 6280213)
Head Law Firm, LLC
4422 N. Ravenswood Ave.
Chicago, IL 60640
Tel:  (404) 924-4151
Fax: (404) 796-7338
Email: ahead@headlawfirm.com
       bhilbert@headlawfirm.com

*admitted *pro hac vice*
*Attorneys for Plaintiffs and the Class/Collective*

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that on this 17th day of January, 2025, a copy of the foregoing **Plaintiffs' Motion for Rule 23 Class Certification and Final FLSA Collective Certification** was filed electronically with the Clerk of Court using the CM/ECF system, which provided electronic service to all parties.

*/s/ Seth R. Lesser*

Seth R. Lesser